BLANK ROME LLP
Attorneys for Debtor
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000
Marc E. Richards
Joel C. Shapiro
Scott F. Budzenski

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ---------------------------------------------------- | x | |
| In re: | : | |
| | : | |
| METROPOLITAN 885 THIRD AVENUE | : | Case No. [          ] |
| LEASEHOLD, LLC, | | |
| | : | Chapter 11 Case |
| Debtor. | : | |
| ---------------------------------------------------- | x | |

## <u>DISCLOSURE STATEMENT FOR THE DEBTOR'S PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION</u>

**BLANK ROME LLP**

Marc E. Richards
Scott F. Budzenski
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0208
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

and

Joel C. Shapiro, Esquire
130 North 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5500
Facsimile: (215) 569-5555

*Attorneys for Debtor*

Dated: November 12, 2010

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION AND SUMMARY .................................................................................3
    A.   Disclosure Statement Enclosures ........................................................................4
    B.   Only Impaired Classes Vote ................................................................................4
    C.   Confirmation Hearing .........................................................................................5

II. OVERVIEW OF THE PLAN .........................................................................................5
    A.   Introduction ........................................................................................................5
    B.   Summary of Distributions ...................................................................................6

III. OVERVIEW OF CHAPTER 11 ...................................................................................7

IV. DESCRIPTION OF THE DEBTORS' BUSINESS .....................................................8
    A.   The Debtor ..........................................................................................................8
    B.   The Pre-Petition Capital Structure ...................................................................10
    C.   Events Leading to Chapter 11 Filing ................................................................11

V. THE FILING ...............................................................................................................12
    A.   Significant "First Day" Motions .......................................................................12
    B.   Use of Cash Collateral ......................................................................................16
    C.   Claims Process ..................................................................................................16
    D.   Committee Process ............................................................................................17

VI. DESCRIPTION OF SIGNIFICANT LITIGATION ..................................................17
    A.   Preferences, Fraudulent Transfers and Other Avoidance Actions....................17
    B.   Other Causes of Action .....................................................................................17
    C.   Litigation Pending Against Debtor ...................................................................18

VII. SUMMARY OF PLAN PROVISIONS .....................................................................18
    A.   Introduction ......................................................................................................18
    B.   Method of Classification of Claims and Interests and General Provisions ..................19
    C.   Unclassified Administrative Claims, Priority Tax Claim, and Fee Claims..................20
    D.   Classification and Treatment of Claims and Interests .....................................20
    E.   Means For Implementation Of The Plan ..........................................................22
    F.   Treatment Of Executory Contracts And Unexpired Leases .............................27
    G.   Effect of Confirmation of the Plan....................................................................28
    H.   Retention of Jurisdiction ...................................................................................31
    I.   Miscellaneous Provisions..................................................................................31
    J.   Conditions to Confirmation and Effectiveness of the Plan...............................33
    K.   Provisions Regarding Corporate Governance and Management of the Reorganized Debtor....................................................................................................35

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ............................................35
    A.   Taxation ............................................................................................................35
    B.   Distributions to Holders of Claims ...................................................................35
    C.   Objections to Classification ..............................................................................36

    D.   Inherent Uncertainty of Financial Projections ...............................................36

    E.   Certain Bankruptcy Law Considerations.......................................................36

IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......37

    A.   Liquidation Under Chapter 7 ........................................................................37

    B.   Alternative Plan of Reorganization...............................................................37

X.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................38

    A.   Federal Income Tax Consequences in General...............................................38

    B.   Federal Income Tax Consequences to the Debtor ..........................................39

    C.   Federal Income Tax Consequences to Holders of Allowed Claims in Class 3 ............39

    D.   Federal Income Tax Consequences to Holders of Allowed Class 4 Interests ..............40

    E.   Importance of Obtaining Professional Tax Assistance....................................41

134588.00401/21794809v.26

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED IN CONJUNCTION WITH THE DEBTOR'S PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION ("PLAN") THAT WAS FILED WITH THE CHAPTER 11 PETITION.  THE DEBTOR UTILIZED THIS DISCLOSURE STATEMENT TO SOLICIT THE VOTES OF THE TWO CLASSES THAT ARE IMPAIRED UNDER THE PLAN THAT ARE ENTITLED TO VOTE.  GENERAL UNSECURED CREDITS ARE UNIMPAIRED UNDER THE PLAN AND PRESUMED TO HAVE VOTED IN FAVOR OF THE PLAN WHILE THE TWO IMPAIRED CLASSES (ROYAL BANK OF CANADA AND THE HOLDERS OF 100% OF THE MEMBERSHIP INTERESTS IN THE DEBTOR) VOTED TO ACCEPT THE PLAN PRIOR TO THE COMMENCEMENT OF THE CASE.  THE PLAN WILL PROVIDE FOR THE RESTRUCTURING OF THE OBLIGATIONS TO ROYAL BANK OF CANADA (WHO HOLDS A FIRST LIEN ON ALL OF THE DEBTOR'S ASSETS) AND THE ISSUANCE OF NEW MEMBERSHIP INTERESTS IN THE DEBTOR IN CONSIDERATION FOR CERTAIN NEW EQUITY CONTRIBUTIONS TO BE MADE TO REORGANIZED DEBTOR.

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS OR INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALL CREDITORS AND INTEREST HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.  SEE "CERTAIN RISK FACTORS TO BE CONSIDERED," Article VIII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR, ITS BUSINESS, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASE, HAS BEEN PREPARED AND OBTAINED BY THE DEBTOR AND ITS PROFESSIONALS FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTOR. NEITHER THE DEBTOR NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, OR OTHERWISE HAVE ANY PRECLUSIVE EFFECT, BUT RATHER SHALL CONSTITUTE AND BE CONSTRUED AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. SEE ARTICLE VII. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE FINANCIAL PROJECTIONS ATTACHED HERETO WERE PREPARED BY THE DEBTOR WITH THE ASSISTANCE OF ITS FINANCIAL ADVISOR BASED ON INFORMATION AVAILABLE TO THE DEBTOR AND NUMEROUS ASSUMPTIONS THAT ARE AN INTEGRAL PART OF THE FINANCIAL PROJECTIONS, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR AND SOME OR ALL OF WHICH MAY NOT MATERIALIZE. THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTOR'S INDEPENDENT CERTIFIED ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, LITIGATION, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY, IF NOT ALL, OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR OR ANY OTHER PERSON, THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS.

## I. INTRODUCTION AND SUMMARY

Metropolitan 885 Third Avenue Leasehold, LLC (the "Debtor"), submits this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") and applicable non-bankruptcy law, to holders of Claims against and Interests in the Debtor in connection with the pre-petition solicitation of acceptances of the Debtor's Prepackaged Chapter 11 Plan of Reorganization dated November 12, 2010 (the "Plan"), as such plan may be amended (the "Plan"), to be filed by the Debtor with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and projected financial statements and notes thereto appearing elsewhere in this Disclosure Statement together with any relevant Exhibits and Appendices.

This Disclosure Statement describes certain aspects of the Plan, the Debtor's operations, significant events that should occur in the Debtor's chapter 11 case and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

## A.  *Disclosure Statement Enclosures*

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (<u>Exhibit A</u>);

- Proposed Order (i) Scheduling a combined hearing under 11 U.S.C. § 105(d)(2)(B)(vi) to approve the adequacy of the Solicitation and Disclosure Statement and the Prepetition Solicitation Procedures and confirmation of the Prepackaged Chapter 11 Plan of Reorganization, (ii) Establishing deadlines and procedures for filing objections to the approval of the Solicitation and Disclosure Statement or the Prepetition Solicitation Procedures or Confirmation of Plan, and (iii) Approving the form and manner of Notice of the Confirmation Hearing ("Solicitation Procedures Order") ("<u>Exhibit B</u>");

- Financial Projections (Plan Supplement);

- Liquidation Analysis (Plan Supplement).

- Exit Facility Plan Support Agreement from RBC (Plan Supplement), Equity Commitment Plan Support Agreement from Plan Funders (Plan Supplement) and Plan Support Agreement – Existing Equity (Plan Supplement).

- Designation of Post-Confirmation Members and Managers (Plan Supplement)

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Impaired Claims and Interests that the Debtor believes are entitled to vote to accept or reject the Plan.

The Solicitation Procedures Order sets forth in detail the deadlines, procedures and instructions for filing objections to confirmation of the Plan. In addition, detailed voting instructions accompany each Ballot. Each holder of an Impaired Claim or Interest entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

## B.  *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and would to be entitled to vote.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of claims in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if (i) at least one class of impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

In addition, if any Impaired Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, or the conditions of Section 10.2(f) of Plan are not satisfied then the Debtor reserves the right to seek to have the Bankruptcy Court confirm the Plan (after appropriate amendments are made) under the cram-down provisions of section 1129(b) of the Bankruptcy Code as to Class 3 creditors.

Under the Plan, Claims in Classes 2 and 4 are or may be Impaired and are entitled to vote on the Plan. Under the Plan, Claims in Classes 1 and 3 are unimpaired, and the holders of Class 1 and 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN WAS PROVIDED ONLY TO HOLDERS OF CLAIMS AND INTERESTS IN CLASSES 2 and 4. The Debtor commenced the solicitation process for the Plan prior to the Petition Date and received ballots indicating the acceptance of the Plan from Class 2 and Class 4 prior to the Petition Date and prior to the deadline of November 29, 2010 for returning all ballots.

For a summary of the treatment of each Class of Claims and Interests, see "Overview of the Plan" below.

## C. *Confirmation Hearing*

The Bankruptcy Court has scheduled the Confirmation Hearing for December [___], 2010 at 11:00 a.m. (ET) in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before December 17, 2010 at 4:00 p.m. (ET) in the manner described in the Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

## II. OVERVIEW OF THE PLAN

## A. *Introduction*

The Plan is the product of the effort by the Debtor's management and its professional advisors to develop a plan that will enable Creditors and Interest holders to receive the maximum recovery possible in this case with the consent of the Impaired Classes. The valuation of the Debtor and the Reorganized Debtor, upon which certain distributions contemplated by the Plan

are based, is derived in part from projections of the future performance of the Reorganized Debtor. The financial projections, which were prepared by the Debtor with the assistance of its advisors, are attached to the Plan Supplement.

THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO MAXIMIZE THE RECOVERY TO ITS CREDITORS AND INTEREST HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS CREDITORS AND INTEREST HOLDERS. THE DEBTOR THEREFORE URGES THOSE PARTIES ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

## B. Summary of Distributions

Under the Plan, Claims against and Interests in the Debtor are divided into Classes and will receive the distributions and recoveries (if any) described in the table below. The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan. The ranges of the Estimated Amount of Allowed Claims set forth in the following table reflect the amounts listed in the Debtor's Bankruptcy Schedules (low end of range) and assumes Unsecured Claims will not exceed $1,000,000.00 (high end of range). The Debtor has not completed the analysis or reconciliation of the Claims.

| Class | Type of Claim or Membership Interest | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Unclassified | Administrative Claims | $ | 100% |
| Unclassified | Fee Claims | $100,000.00[1] | 100% |
| Unclassified | Priority Tax Claims | $2,933,360[2] | 100% |
| Unclassified | UST Quarterly Fees Under 28 U.S.C. § 1930 | $10,000.00[3] | 100% |
| 1 | Other Priority Claims | $13,289.96 | 100% |
| 2 | RBC Secured Claim | $130,000,000[4] | 61% |
| 3 | General Unsecured Claims | $1,000,000 | 100%[5] |
| 4 | MJM Interests | N/A[6] | 1.65% |

[1] The above estimate represents the total amount of Fee Claims (excluding the RBC Expenses) that may be incurred and requested from the Petition Date through the Confirmation Date.

[2] Certain of the Debtor's taxes are currently the subject of an audit and, therefore, the actual allowed amount of the Priority Tax Claims could be materially higher or lower. The Debtor has been and continues to escrow, on a monthly basis, real estate taxes and the amount reflects the anticipated tax liability due for July – October 31, 2010 and all such amounts are being held in an escrow account with RBC ("Tax Account"). As such, the Debtor/Plan Funders shall not be required to pay the same on the Effective Date but rather will pay when due in December of 2010 from the Tax Account.

[3] Estimated Fourth Quarter Fee due under 28 U.S.C. § 1930.

[4] RBC's asserted Secured Claim is $210,000,000.00, plus accrued interest, costs, expenses, penalties and fees.

[5] The above estimate is preliminary and includes all unsecured creditors in the Debtor's case and no representations are being made with respect thereto as underlying this estimate are a number of assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor. This estimate is predicated upon (i) RBC not receiving any distributions on account of its Deficiency Claim, (ii) Unsecured Claims not to exceed $1,000,000.00 and (iii) the trade claims being paid in the ordinary course of Debtor's operations.

134588.00401/21794809v.26

ALTHOUGH THE DEBTOR BELIEVES THAT THE ESTIMATED PERCENTAGE RECOVERIES ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERY, THERE IS NO ASSURANCE THAT THE FINAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE AMOUNTS SHOWN IN THE TABLE ABOVE AND THEREFORE POSSIBLY DEPLETE THE ESTIMATED PERCENTAGE RECOVERY.  The actual recoveries under the Plan by the Debtor's creditors will be dependent upon a variety of factors including, but not limited to, whether, and to what extent, Disputed Claims are resolved in favor of the Debtor rather than the Creditors.  Accordingly, no representation can be or is being made with respect to whether each estimated recovery shown in the table above will be realized by the holder of an Allowed Claim or Interest.

## III.  OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders.  A goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon, among others, a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

A plan and a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan may be disseminated to the holders of claims against or interests in a Debtor in connection with the solicitation of their vote to accept or reject the plan under certain circumstances.

---

[6]  In consideration for the equity commitment pursuant to the terms of the Equity Commitment Plan Support Agreement, Plan Funders shall receive 100% of the New Membership Interests in Reorganized Debtor.  The MJM Interests will be terminated and extinguished but MJM shall receive the MJM Payment which shall be distributed to MJM's members in accordance with certain agreements.

134588.00401/21794809v.26

# IV.  DESCRIPTION OF THE DEBTORS' BUSINESS

### A.    The Debtor

The Debtor was organized in 2007 as a Delaware Limited Liability Company and is a wholly owned by Metropolitan 885 Third Avenue Leasehold Sub Junior Mezz, LLC ("Parent" or "MJM"), a Delaware Limited Liability Company.  The Debtor owns a 34 story Class A office building located on the eastside of Third Avenue between 53rd and 54th Streets, New York, New York.  The building was completed in 1986 and is commonly known as the Lipstick Building for its distinctive elliptical shape.  The Third Avenue Property consists of rentable commercial space, approximately 63.5% of which is occupied by one tenant (with the lease termination date of June 2021).  The property is currently zoned for C6-6/C1-9 Commercial/Retail.  The Debtor has no employees.  Metropolitan Real Estate Investors, LLC, a California limited liability company is the Asset Management Company ("Asset Management Company") with respect to the Third Avenue Property and CB Richard Ellis, Inc. ("CBRE") is the on-site manager for the day-to-day operations of the Third Avenue Property.  CBRE makes payment to its employees who perform the day-to-day operations of the Third Avenue Property.  The Asset Management Company is the managing member of Metropolitan 885 Third Avenue LLC, a Delaware limited liability company ("Metropolitan"), which in turn is a managing member of Metropolitan 885 Third Avenue Leasehold Holdings LLC ("MTAL").  The Debtor obtained its interest in the property through two ground leases as the land is divided into two adjacent parcels, the first measuring 5,500 square feet and the second measuring 20,635 square feet.  The Debtor's interest under the ground leases can be more fully described as follows:

> "**Third Avenue Property**" shall mean the Debtor's interests in that certain commercial property located at 885 Third Avenue, New York, including, without limitation, all of the Debtor's rights pursuant to those certain ground leases as follows (collectively the "**Ground Leases**"): (a) Parcel 1, 2 and 3:  that certain Ground Lease dated as of July 9, 2007, between 885 Third Fee LLC and GKK 885 Third LLC, collectively, as lessor, and Debtor, as lessee, evidenced by that certain Memorandum of Ground Lease recorded August 7, 2007 as CRFN 2007000407290, as to the property described therein; and (b) Parcel 4:  that certain Ground Sub-Sublease dated as of July 9, 2007 between 885 Third Fee LLC and GKK 885 Third LLC, collectively, as lessor, and Debtor, as lessee, evidenced by that certain Memorandum of Ground Sub-Sublease recorded August 7, 2007 as CRFN 200700040792, as to the property described therein, together with the Debtor's interest in any of the improvements on such property and in all furniture, fixtures, equipment and all leases, rents, issues and profits related thereto.

The Debtor's Organizational Structure may be summarized as follows:



Metropolitan
885 Third Avenue
Leasehold LLC, a Delaware
limited liability company
("Debtor")

Debtor

100%
Owner

Metropolitan
885 Third Avenue
Leasehold Sub Junior Mezz
LLC, a Delaware limited liability
company ("Parent")

Parent

100%
Owner

Metropolitan
885 Third Avenue
Leasehold Holdings LLC, a
Delaware limited liability
company ("MTAL")

MTAL

Managing
Member

Metropolitan
885 Third Avenue
LLC, Delaware limited liability
company
("Metropolitan")

Metropolitan

Managing
Member

Metropolitan Real Estate
Investors, LLC, a California
limited liability company
("Management Company")

Management Company

9

**B.        *The Pre-Petition Capital Structure***

Prior to the Petition Date, Debtor was indebted to RBC in the principal amount of $210,000,000.00 (the "RBC Loan"). The RBC Loan was secured by a lien on the Third Avenue Property. MJM owns 100% of the membership interests of Debtor. In connection with the RBC Loan, Debtor also obtained an initial equity infusion from MTAL in the amount of $117,930,000.00. One of the members of MTAL is entitled to receive a preferred return on its investment before any of the other members. As of the Petition Date, the outstanding borrowings from RBC under the secured term loans is in the principal amount of $210,000,000.00 million, plus accrued interest, costs, expenses, penalties and fees.

Under the RBC Loan, the Debtor is the borrower. As noted, the sole 100% member of the Debtor is Parent. The 100% member of the Parent is MTAL. MTAL is owned by Metropolitan and by Goldman, Sachs & Co., a New York limited partnership ("GS"). Metropolitan is the managing member of MTAL. MTAL is governed under the terms and conditions a certain Amended and Restated Limited Liability Company Agreement dated as of July 3, 2008, as amended (the "LLC Agreement").

Pursuant to that certain loan agreement, dated as of July 9, 2007, RBC, as collateral agent for the benefit of the holder or holders of Note A and Note B and their respective successors and assigns made the RBC Loan to Debtor in the original aggregate principal amount of $210,000,000. The RBC Loan is evidenced by a certain Amended, Restated and Consolidated Promissory Note (Note A) in the original principal amount of $125,000,000 ("Note A") and that certain Amended, Restated and Consolidated Promissory Note ("Note B") in the original principal amount of $85,000,000 ("Note B"; and together with Note A, collectively, the "Original Notes"), in each case dated as of July 9, 2007 (the "Original Closing Date").

The Original Notes are in turn secured, *inter alia*, by that certain Amended, Restated and Consolidated Leasehold Mortgage, Security Agreement, Fixture Financing Statement and Assignment of Leases and Rents, dated as of the Original Closing Date (the "Original Mortgage") and recorded as Document ID: 2007071901142013 on August 7, 2007 and encumbering the Third Avenue Property.

The Debtor also entered into the following documents on the Original Closing Date in connection with the RBC Loan: (i) an Assignment of Leases and Rents; (ii) an Environmental Indemnity Agreement; (iii) a Subordination of Asset Management Agreement and Management Fees – Metropolitan Real Estate Investors, LLC, a California limited liability company (signed as Manager of the Third Avenue Property); (iv) a Limited Guaranty; (v) a Subordination of Management Agreement and Management Fees; (vi) a Deposit Account Control Agreement (Security Deposits) (Three Party Hard Lockbox) by and among Borrower, Lender and PNC Bank, National Association ("PNC"); (vii) a Deposit Account Control Agreement (Three Party Hard Lockbox) by and among Debtor, RBC and PNC; (viii) a Deposit Account Control Agreement by and among Debtor, RBC and Bank of America, N.A. ("BofA"); and (ix) a state level UCC and a county level UCC fixture filing.

Pursuant to the terms of a certain Limited Guaranty and Pledge Agreement dated as of July 3, 2008, Metropolitan pledged to GS the proceeds in a certain escrow account established

pursuant to that certain Deposit Account Agreement dated as of August 25, 2008, by and among Wachovia Bank, N.A., Metropolitan and GS ("Escrow Account"). Amounts in the Escrow Account were to be utilized to fund the shortfalls, if any, in minimum monthly payments that Metropolitan had guaranteed would be paid to GS by MTAL.

On and after the Original Closing Date, rents and other proceeds from the Third Avenue Property were to be deposited in a debt service fund for the benefit of RBC ("Debt Service Fund") in respect of the RBC Loan. Amounts were deposited in the Debt Service Fund were to be applied by RBC to pay "Debt Service" (as defined in the RBC Loan) due on the RBC Loan.

## C. Events Leading to Chapter 11 Filing

Pursuant to Section 6(d) of the RBC Loan, the Debtor is required to maintain a balance of at least $2,300,000 in a the Debt Service Fund to pay monthly interest. On April 6, 2010, Midland Loan Services, Inc., acting as Servicer of the Loan on behalf of RBC ("Servicer"), emailed the Debtor that as of April 1, 2010, disbursement from the Debt Service Fund caused the balance of the Debt Service Fund to drop below the required $2,300,000 threshold. On April 19, 2010, RBC delivered a written default notice to Debtor that Debtor was required to deposit funds equal to $280,126.41 to cover the shortfall in the Debt Service Fund. On May 5, 2010, Servicer once again emailed Debtor informing Debtor that a disbursement from the Debt Service Fund to fund the debt service had caused the balance of the Debt Service Fund to be below $2,300,000. On May 17, 2010, RBC delivered a second written default notice to Debtor that Debtor was required to deposit funds equal to $621,394.51 to cover the shortfall in the Debt Service Fund.

Debtor failed to replenish the Debt Service Fund to the $2,300,000 required threshold within the timeframe required by RBC.

In connection with the Debtor's failure to replenish the Debt Service Fund, RBC filed an action in foreclosure ("Foreclosure Action") against Debtor on June 21, 2010 in the Supreme Court of the State of New York County of New York (Index No. 650675/10). The foreclosure complaint alleges that the Debtor failed to maintain a balance of $2,300,000 (and continues to do so) in the Debt Service Fund and that RBC accordingly elected to accelerate the entire indebtedness due under the Original Loan Documents.

In addition to the issues with RBC, the causes which gave rise to the need to seek relief under Chapter 11 are numerous. First, the recent violent downturn in the building and real estate markets have had a significant impact on the Debtor's operations. Vacancy rates have increased making it more challenging to service the debt on the property. Renewal lease rates have also been lower than anticipated. Such lower renewal lease rates have continued to negatively impact the cash flow of the Third Avenue Property, which resulted and continues to result in an undue strain on the Debt Service Fund.

A substantial portion of the Debtor's revenue has been impacted by contractions in the commercial real estate markets throughout the United States. By way of example, Debtor's tenant base is strongly associated with consumer confidence in the economy and the financial industry and as such, has been affected by the current recession. In brief summary, the

significant decline in rental revenue and liquidity position compelled the Debtor to seek an alternative to its current position.

The Plan reflects a commitment by RBC to support the Debtor with use of cash collateral throughout the chapter 11 proceedings provided that RBC receives certain protections together with an agreement to substantially reduce the debt load being secured by the Third Avenue Property from $210,000,000.00 to $130,000,000.00 solely in connection with the Plan. In addition, subject to the terms and conditions of the Equity Commitment Letter, Plan Funders will provide an equity infusion of $15,000,000 plus (i) the amount of the MJM Payment, (ii) the Class 3 Reserve Payment or the Class 3 Payment (as defined in the Equity Commitment Letter), and (iii) such other amounts as set forth in the Equity Commitment Letter and provide cash to the Debtor for the initial payments due to RBC and creditors under the Plan. Lastly, the Plan contemplates that RBC will be waiving its unsecured deficiency claims in the amount of approximately $80,000,000.00 plus interest, costs, fees, penalties and expenses in connection with the overall restructuring. This is expected to allow Class 3 Unsecured Creditors to receive payment in full on account of their claims. In the event that the Plan is contested and does not become effective, RBC will continue to have a claim against the Debtor for the $210 million principal amount of the RBC Loan, plus accrued interest, costs, expenses, penalties and fees.

The Plan and Disclosure Statement were reviewed and approved by all Impaired Classes prior to the Petition Date. In addition, the Debtor entered into the Equity Commitment Plan Support Agreement, Exit Facility Plan Support Agreement and the Plan Support Agreement – Existing Equity. These agreements provide for the treatment under the Plan, the means to consummate the Plan, as well as the counterparties' agreement to vote in favor of the Plan. These agreements are attached to the Plan Supplement.

## V. THE FILING

On November 15, 2010 (the "Petition Date"), the Debtor anticipates that it will file a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor will continue in possession of its property pursuant to sections 1107(a) and 1108 of the Bankruptcy Code after the Petition Date. The Debtor will, with the Bankruptcy Court's approval, employ and retain Blank Rome LLP, as its bankruptcy counsel.

## A. *Significant "First Day" Motions*

Immediately after the filing of its chapter 11 petition, the Debtor anticipates filing numerous "first day" motions seeking orders from the Bankruptcy Court authorizing the Debtor to retain professionals and providing the Debtor relief from certain administrative requirements imposed by the Bankruptcy Code. These orders will be requested to ease the strain on the Debtor's relationships with tenants, employees and others as a consequence of the filing. In particular, the Debtor will seek to obtain (subject to its right to amend or withdraw) orders approving the following motions and applications and otherwise file the following pleadings:

1. Scheduling Motion for a Prepackaged Chapter 11 Case

   - By this Motion, the Debtor seeks entry of an order (i) scheduling the Confirmation Hearing and to approve the adequacy of the information contained in the Solicitation and Disclosure Statement and the Prepetition Solicitation Procedures and consider confirmation of the Plan, (ii) establishing deadlines and procedures for filing objections to approval of the Solicitation and Disclosure Statement, the Prepetition Solicitation Procedures or confirmation of the Plan, and (iii) approving the form and manner of notice of the commencement of this chapter 11 case and the scheduling of the Confirmation Hearing.

2. Prepackaged Chapter 11 Plan of Reorganization

   - As more fully set forth above, the Debtor's Plan provides that, *inter alia*, the Debtor will repay a portion of the outstanding principal amount of the RBC Loan in an amount equal to $15,000,000, and RBC has agreed upon emergence to further reduce the outstanding principal amount of the Original Notes so that the same shall have an outstanding principal amount equal to $115,000,000. The Current Equity Plan Support Agreement acknowledges the treatment of direct and indirect members of the Debtor.

3. Disclosure Statement for the Debtor's Plan of Reorganization

   - The Disclosure Statement describes the Debtor's Plan of Reorganization and is intended to solicit votes on the Plan from holders of RBC Secured Claims (Class 2) and MJM Interests (Class 4) (each as defined in the Plan). The Disclosure Statement was transmitted and/or made available to each person or entity that was entitled to vote on the Plan.

4. Cash Collateral Motion and Stipulation (Interim and Final Orders)

   - By this Motion, the Debtor seeks entry of an Interim Order (i) authorizing the Debtor to use cash, that may otherwise serve as collateral security for the amounts owed to RBC (the "Cash Collateral"), pursuant to a limited budget subject to approval by RBC (the "Budget"), as working capital to purchase goods and services and pay operating expenses related to the Third Avenue Property in the ordinary course of business, and in order to preserve the value of the Debtor's estate, including, without limitation, using Cash Collateral per the Budget for a brief interim period to satisfy (a) any prepetition operating and other expenses approved by the Court, (b) obligations incurred in the ongoing postpetition operations of the Debtor, and (c) any and all costs and expenses arising in connection with the administration of the Debtor's estate, on an interim basis and pending a final hearing; (ii) directing that the Debtor make adequate protection payments provided for per the Budget and provide certain additional

adequate protection to RBC; and (iii) scheduling a final hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion. RBC has consented to the Debtor's use of Cash Collateral as set forth in the Motion and pursuant to the Budget and the proposed Interim Order.

5. Resolution Authorizing Certain Actions

- Provides for adoption of certain resolutions authorizing the Debtor to file this chapter 11 case, take certain action and seek related relief in connection therewith.

Declaration of Jacob Abikzer

- The Declaration is filed pursuant to Rule 1007-2 of the Local Bankruptcy Rules and is intended to provide a summary overview of the Debtor and this chapter 11 case. The Declaration provides an overview of the Debtor's business, background, capital structure, and the circumstances giving rise to the commencement of this chapter 11 case. The Declaration also summarizes the relief requested in each of the First Day Pleadings and lists the schedules and information required by Local Bankruptcy Rule 1007-2.

Bar Date Motion and Order

- By this Motion, the Debtor seeks entry of an order establishing December 20, 2010 as a bar date to file proofs of claim in this case.

Garden City Retention Application and Order

- By this Application, the Debtor seeks entry of an order approving the retention and employment of The Garden City Group, Inc. as the claims agent for the Debtor in this case.

Schedules and Statement of Financial Affairs

- In accordance with the Bankruptcy Code and the Local Rules, the Debtor filed its Schedules and Statement of Financial Affairs listing, *inter alia*, the Debtor's assets, liabilities and other financial information as well as sources of income, transfers of property and lawsuits by creditors.

Blank Rome Retention Application and Order

- By this Application, the Debtor seeks entry of an order approving the retention and employment of Blank Rome LLP as bankruptcy counsel for the Debtor in this case.

14

Cash Management Motion (Interim and Final Orders)

- By this Motion, the Debtor seeks authorization to continue using its existing bank accounts and cash management systems.

6. Utilities Motion and Final Order

- By this Motion, the Debtor seeks approval of adequate assurance of payments to utilities, and approval of procedures to determine the amount of adequate assurance payments.

7. Interim Payment Procedures Motion and Final Order

- By this Motion, the Debtor requests entry of an order establishing an orderly, regular process for interim approval and payment of compensation and reimbursement of expenses for attorneys and other professionals whose services are authorized by this Court and who will be required to file applications for allowance of compensation and reimbursement of expenses.

8. Proposed $130 Million Dollar Exit Facility Financing Term Sheet and Plan Support Agreement with RBC

- The Exit Facility Plan Support Agreement with RBC acknowledges RBC's support for the Debtor's Plan of Reorganization in accordance with the terms thereof.

9. Proposed $15,000,000 Equity Commitment Letter from New Lipstick LLC

- The Equity Commitment PSA from New Lipstick LLC provides the equity commitment of the Plan Funders in the aggregate committed amount of $15,000,000.00 plus the (i) amount of the MJM Payment, (ii) Class 3 Reserve Payment or the Class 3 Payment (as defined in the Equity Commitment Letter); and (iii) such other amounts as set forth in the Equity Commitment Letter).

10. Plan Support Agreement – Existing Equity

- The Plan Support Agreement – Existing Equity acknowledges the treatment and support for the Debtor's Plan of Reorganization by the direct and indirect members of the Debtor.

11. Cash Flow Projections for Disclosure Statement

- The Cash Flow Projections filed with the Debtor's Disclosure Statement was prepared by the Debtor with the assistance of its accountants.

12. Liquidation Analysis for Disclosure Statement

- The Liquidation Analysis filed with the Debtor's Disclosure Statement was prepared by the Debtor with the assistance of its appraiser.

13. Designation of Post-Confirmation Members, Managers and/or Officers information Required by Local Bankruptcy Rule 1007-2

- The Debtor filed the Designation of Post-Confirmation Members, Managers and/or Officers information in accordance with Local Bankruptcy Rule 1007-2.

14. Motion to Pay Pre Petition Indebtedness

- Motion to pay ordinary course pre petition indebtedness.

## B. Use of Cash Collateral

### 1. *Use of Cash Collateral*

Essential to the Debtor's efforts to reorganize is obtaining a source of post-petition funding. To that end, the Debtor will file a Motion for Order (I) Authorizing the Debtor to Utilize Cash Collateral and Granting Super Priority Claims and Replacement Liens [Docket No. ___] (the "Cash Collateral Motion") in favor of RBC. The Debtor will request that by the terms of a certain Consent Order negotiated with RBC, the Bankruptcy Court should approve the Debtor's use of cash collateral subject to the lien in favor of RBC (the "Cash Collateral Agreement"). Pursuant to the terms of the Cash Collateral Agreement and the budget attached thereto, RBC will make the rental income available to the Debtor to make ordinary course payments. The Obligations (as defined in the Final Cash Collateral Order) are secured by valid and perfected priming liens and security interests granted to RBC on all of the Debtor's assets and properties.

## C. Claims Process

### 1. *Last Date to File Proofs of Claim*

The Debtor will request that the Bankruptcy Court enter an order (the "Bar Date Order") [Docket No. ___] generally requiring any Person holding or asserting a Claim against the Debtor to file a written proof of claim with Debtor, on or before 5:00 p.m., prevailing Eastern Time on December 20, 2010. The Bar Date Order will provide that any person or entity failing to timely file a proof of claim will be forever barred, estopped and enjoined from (a) asserting a timely filed claim against the Debtor that the entity has that (i) is in an amount that exceeds the amount, if any, that is identified in the Schedules of Assets and Liabilities on behalf of such entity as undisputed, non-contingent and liquidated (if no amount is identified therein for that entity then the entity shall be forever barred, estopped and enjoined from asserting any claim at all against the Debtor) or (ii) is of a different nature or a different classification than any claim identified in the Schedules of Assets and Liabilities on behalf of such entity; or (b) voting upon, or receiving distributions under, any plan or plans of reorganization in this case in respect of a Claim. The Bar Date Order will provide other bar dates in other circumstances as set forth in that order.

### D.    Committee Process

####     1.    _Formation of an Official Committee of Unsecured Creditors._

Subsequent to the Petition Date, the Office of the United States Trustee may solicit the Debtor's creditors to determine whether there was an interest from the same in forming an Official Committee of Unsecured Creditors under 11 U.S.C. §1102.  The Debtor believes that it may be advised by the Office of the United States Trustee that a Committee of Unsecured Creditors will not be formed due to insufficient interest on the part of the Debtor's creditors and the fact that unsecured creditors are unimpaired under the Plan but no guarantee can be made that such a committee will not be formed.

## VI.  DESCRIPTION OF SIGNIFICANT LITIGATION

### A.    Preferences, Fraudulent Transfers and Other Avoidance Actions

Pursuant to section 547 of the Bankruptcy Code, a Debtor may recover certain preferential transfers of property, including cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the transferee not received the payment and had the Debtor been liquidated under chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the Debtor's and the transferee's business according to ordinary business terms are not recoverable.  Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a preferential transfer were recovered by the Debtor, the transferee would have a general unsecured claim against the Debtor to the extent of the Debtor's recovery.

The Debtor estimates that it made payments in the approximate amount of $2,742,472.00 to various creditors within the ninety-day period preceding the Petition Date.  The Debtor has analyzed these payments to determine whether the same are preferences (within the meaning of the Bankruptcy Code) but has determined that all such payments were made in the ordinary course of business and, therefore, such payments would be entitled to utilize the ordinary course defense under 11 U.S.C. §547(c)(2).

Under the Plan, the Reorganized Debtor will not have the authority to investigate and prosecute Avoidance Actions in accordance with section 1123(b)(3) of the Bankruptcy Code.

### B.    Other Causes of Action

####     1.    _Investigation of Causes of Action_

The Reorganized Debtor has investigated potential causes of action against a number of Persons, relating to, among other things, the following (collectively, the "Non-Avoidance Causes

of Action"):

> • Any lawsuits for, or in any way involving, the collection of accounts receivable or any matter related to the Plan;

> • Any actions against lessees, sublessees, or assignees arising from various leases, subleases, and assignment agreements relating thereto, including, but not limited to, actions for overcharges relating to taxes, common area maintenance and other similar charges;

> • Any litigation or lawsuit initiated by the Debtor that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association or any other court or tribunal;

> • Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtor's business operations.

In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtor and as a result, cannot be raised during the pendency of the case (collectively, "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtor to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtor and Reorganized Debtor.

All Non-Avoidance Causes of Action and all Unknown Causes of Action not otherwise released in the Plan shall be retained by the Reorganized Debtor.

### C. *Litigation Pending Against Debtor*

In addition to the Foreclosure Action, Debtor is currently a defendant in two pending lawsuits alleging personal injury claims (one by Mahadaya Persaud and the other by Hilary Viachor) incurred at the Third Avenue Property. Both of these matters are being covered by the Debtor's insurance carrier. In the event of any self insured deductible or Claim in excess of the policy limits, the same shall be treated as Class 3 Unsecured Claims; provided, however, Debtor has been advised that the amount of damages being sought in the two actions are within the policy limits of Debtor's insurance policy.

## VII. SUMMARY OF PLAN PROVISIONS

### A. *Introduction*

The Plan is the product of diligent efforts by the Debtor to formulate a plan that provides for a fair allocation of the Debtor's assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law. The valuation obtained by the Debtor reflected an aggregate value for the Third Avenue Property as more fully set forth in the Plan Supplement. The principal amount of the aggregate Secured Claim of RBC is approximately $210,000,000.00, i.e., far in excess of the value of the Third Avenue Property.

The Debtor believes that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtor's creditors and interest holders. The Debtor believes, and will demonstrate to the Bankruptcy Court, that the Debtor's creditors will receive significantly more value under the Plan than any available alternative.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

**B.** ***Method of Classification of Claims and Interests and General Provisions***

1. *General Rules of Classification.*

Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes. Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally-defined Class, it shall be included in the more specifically defined Class.

2. *Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims.*

Administrative Claims, Priority Tax Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article III of the Plan in accordance with section 1123(a)(l) of the Bankruptcy Code.

3. *Bar Date for Administrative Claims.*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtor, and its counsel, no later than thirty (30) days after the Effective Date (the "Administrative Claim Bar Date"); provided, however that the costs and expenses of RBC (including but not limited to reasonable attorney's fees, fees of third party consultants and reports, title insurance premiums and all other similar costs or expenses, but subject to the caps set forth in the Exit Facility Plan Support Agreement) hereinafter "RBC Expenses", shall constitute an Allowed Administrative Claim and shall be paid by the Debtor from amounts provided by the Plan Funders without the necessity to file a proof of claim or file any application to or receive any approval from the Bankruptcy Court. Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtor and its counsel, and the party requesting payment of an Administrative Claim within thirty (30) days after the filing of such request for payment. All Post-Petition ordinary course administrative claims shall be paid in the ordinary course during the Chapter 11 Case.

4. *Bar Date for Fee Claims.*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date must be filed and served on the Reorganized Debtor and its counsel no later than twenty (20) days after the Effective Date (the "Fee Claim Bar Date"). Any professional that is required to file and serve a request for payment of a Fee Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Fee Claim or participating in distributions under the Plan on account thereof. Objections to Fee Claims must be filed and served on the Plan Administrator, its counsel and the requesting party by twenty (20) days after the filing of the applicable request for payment of the Fee Claim.

### C.    *Unclassified Administrative Claims, Priority Tax Claim, and Fee Claims*

Administrative Claims, Priority Tax Claims and Fee Claims are not classified in the Plan. The treatment of and consideration to be received by holders of Allowed Administrative Claims, Priority Tax Claims and Fee Claims shall be in full and complete satisfaction, settlement, release and discharge of such Claims.  The Debtor's obligations in respect of such Allowed Administrative Claims, Priority Tax Claims and Fee Claims shall be satisfied in accordance with the terms of the Plan.

Administrative Claims.  Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Administrative Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Administrative Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Administrative Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim and the Debtor prior to the Effective Date and the Reorganized Debtor following the Effective Date might otherwise agree. The total amount of unpaid Allowed Administrative Claims shall be subject to approval by the Bankruptcy Court.  Notwithstanding the foregoing, RBC Expenses shall constitute an Allowed Administrative Claim and shall be paid by the Debtor from amounts provided by the Plan Funders without the necessity to file a proof of claim or file any application to or receive any approval from the Bankruptcy Court.

Priority Tax Claims.  Except as provided herein, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim and the Debtor prior to the Effective Date and the Reorganized Debtor following the Effective Date might otherwise agree, or (at the election of the Debtor or the Reorganized Debtor) (b) over a period of five (5) years from the Petition Date in equal monthly installments of principal plus interest at the rate of six percent per annum.

Fee Claims. Each holder of an Allowed Fee Claim shall receive 100% of the unpaid amount of such Allowed Fee Claim in Cash after such Fee Claim becomes an Allowed Claim.

### D.    *Classification and Treatment of Claims and Interests*

### **Unimpaired Classes**

1. *Class 1 Other Priority Claims*

Class 1 Other Priority Claims. Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Other Priority Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Other Priority Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Other Priority Claim, or (b) such lesser amount as the holder of such Allowed Other Priority Claim and the Debtor prior to the Effective Date and the Reorganized Debtor following the Effective Date might otherwise agree. The holder of a Claim in this Class is not impaired and, therefore, not entitled to vote and is conclusively presumed to have accepted this Plan.

2. *Class 3 General Unsecured Claims*

Class 3 General Unsecured Claims. This Class shall consist of General Unsecured Claims other than Unsecured Deficiency Claim of RBC. Each holder of a General Unsecured Claim shall receive cash on the Effective Date or as soon as practicable thereafter in the full amount of their Allowed Claim (without interest). The holders of Claims in this Class are not impaired and therefore not entitled to vote and are conclusively deemed to have accepted the Plan.

3. *Reservation of Rights.*

Reservation of Rights. Nothing contained herein shall be deemed to limit the right of the Debtor or the Office of the United States Trustee to object to any Administrative Claims (including Fee Claims), Priority Claims, Other Priority Claims, Unsecured Claims and Secured Claims filed in this Chapter 11 Case other than the RBC Claim and RBC Expenses which are deemed Allowed and not subject to objection. Nothing contained herein shall effect the Debtor's or Reorganized Debtor's rights and defenses both legal and equitable, with respect to all members of any Unimpaired Classes including but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments asserted against members of any Unimpaired Classes subject to the releases granted herein.

### Impaired Classes

4.   *Class 2 RBC Claim.*

RBC shall have an Allowed Secured Claim in respect of the RBC Loan in the amount of $210,000,000 plus interest, costs, fees, penalties and expenses (collectively "RBC Claim"). RBC has agreed that solely in connection with the confirmation of this Plan, such claim shall be reduced to the total amount of $130,000,000.00 ("Reduced RBC Allowed Secured Claim") as of the Effective Date and shall continue to be secured by a first lien on the Third Avenue Property under the terms of the RBC Mortgage, as amended by the documents set forth in the Exit Facility Plan Support Agreement. All adequate protection payments made to RBC under the Final Cash Collateral Order prior to the Effective Date with respect to (i) escrowed real estate tax payments; and (ii) escrowed insurance payments, as well as all unapplied pre-petition escrowed payments relating to the same shall be applied by RBC towards the 2010/2011 real estate and insurance payments due and owing to third parties. All adequate protection payments made to RBC other than as set forth in (i) and (ii) herein as well as the capital expenditure reserve, tenant improvement and leasing commission reserves and the tenant security deposit account (as the same are in existence as of the Effective Date) shall be applied by RBC to reduce the RBC Claim and shall not be applied to reduce the Reduced RBC Allowed Secured Claim. The Reduced RBC Allowed Secured Claim shall be repaid as follows: (a) the sum of $15,000,000.00 to be paid on the Effective Date ("Initial RBC Payment"); and (b) the balance of $115,000,000.00 to be repaid in accordance with the terms and conditions of the agreements attached to the Exit Facility Plan Support Agreement. The balance of the RBC Claim in the amount of approximately $80,000,000.00 plus interest, costs, fees, penalties and expenses ("RBC Allowed Deficiency Claim"), solely in connection with the Confirmation and Effective Date of this Plan, shall be deemed waived and extinguished on the Effective Date. RBC reserves the right to assert and vote the RBC Deficiency Claim as a Class 3 Claim but only in the event (i) the Debtor amends this Plan and seeks to solicit the votes of Class 3 Creditors and/or seeks to utilize the cram-down provisions of Section 1129(b) as to Class 3 Unsecured Creditors; or (ii) the Plan does not comply with the Exit Facility Plan Support Agreement and the documents related thereto (without limiting RBC's rights under the Exit Facility Plan Support Agreement and the documents related thereto). RBC is impaired and, therefore, is entitled to vote.

5.   *Class 4 MJM Interests.*

This Class shall consist of the MJM Interest. On the Effective Date, in consideration for the payments described herein, the Class 4 MJM Interest (and all warrants or options relating thereto, if any) shall be deemed cancelled, null and void and of no force and effect. In consideration for such extinguishment of all Class 4 Interests: (i) MJM shall receive the MJM Payment on the Effective Date; (ii) MJM shall distribute the MJM Payment to MTAL; and (iii) MTAL shall distribute the MJM Payment to the members of MTAL pursuant to the provisions of the LLC Agreement, such distributions having been a condition to the granting of consent to the Filing of the Plan, without which such Filing could not have been made. Class 4 Interests are impaired and, therefore, are entitled to vote.

### E.   *Means For Implementation Of The Plan*

1.    *Corporate Action*

On the Effective Date and automatically and without further action, (i) each existing member, officer, director or manager of the Debtor will be deemed to have resigned, (ii) the new members, managers and/or officers of the Reorganized Debtor shall be those identified in the Plan Supplement, and (iii) the Reorganized Debtor shall be authorized, empowered and directed to take all such actions and measures necessary to implement and administer the terms and conditions of the Plan. The Debtor's Operating Agreement will be amended as of the Effective Date to the extent necessary to incorporate the provisions of the Plan and to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code. The rights and interests of the New Membership Interests shall be governed by and controlled pursuant to the terms and conditions of the Reorganized Debtor's Operating Agreement which shall be included in and filed with the Plan Supplement.

2.    *Exit Financing and Equity Commitments*

RBC has agreed, solely in connection with the effectiveness of the Plan, to reduce the outstanding amount under the RBC Loan to $130 million under the terms of a Second Amended Credit Agreement. The principal amount of the RBC Loan upon the Effective Date shall be One Hundred and Thirty Million Dollars ($130,000,000.00) but shall be further reduced by a principal payment of $15,000,000.00 on the Effective Date. Except as expressly set forth in the Plan, or the Plan Funders Equity Commitments, the proceeds of the Plan Funders Equity Commitments shall be used for general working capital and capital expenditures of the Reorganized Debtor, to pay the Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority claims, Allowed Other Priority Claims, the MJM Payment and the initial payment of $15,000,000 under the Reduced RBC Secured Claim. In consideration for meeting its commitments under the Plan Funding Equity Commitments in the aggregate amount of $15,000,000 plus (i) the amount of the MJM Payment, (ii) the Class 3 Reserve Payment or the Class 3 Payment (as defined in the Equity Commitment Letter); and (iii) such other amounts as set forth in the Equity Commitment Letter and provide cash to the Debtor for the initial payments due to RBC and creditors under the Plan, the Plan Funders shall receive 100% of the New Membership Interests in the Reorganized Debtor. Certain direct or indirect members of MJM (but not all) may become members of the Plan Funders in consideration for their new capital contribution. The Plan Funders and certain direct and indirect members of Metropolitan have entered into agreements (including the IRSA Agreements and the Tao-Menofim Agreements) whereby Plan Funders will receive an assignment of such related interests in certain non-Debtor entities for additional consideration as of the Effective Date of the Plan.

In connection with the Reduction in Principal and as provided for in the Plan, the Debtor and RBC have agreed to modify the terms of the RBC Loan. In connection therewith, Debtor and RBC intend to enter into a Second Amended, Restated and Consolidated Promissory Note on the Effective Date of the Plan (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Amended Note"), pursuant to which the Original Notes will be consolidated, amended and restated into a single note in an outstanding principal amount equal to One Hundred Fifteen Million and no /100 Dollars ($115,000,000). The Amended Note will be secured by a Second Amended, Restated and Consolidated Leasehold Mortgage, Security Agreement, Fixture Financing Statement and Assignment of Leases and Rents dated as of the

Effective Date (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "Amended Mortgage"). In the event the Plan does not go effective then, RBC shall have a claim in the amount of $210,000,000.00, plus continuing interest fees, costs, penalties and expenses.

As part of the restructuring of the RBC Loan under the Plan, Plan Funders will also pledge to RBC 100% of the ownership interest in Reorganized Debtor.

Reorganized Debtor and/or certain related entities will also enter into the following documents upon the closing of the restructure and upon the Effective Date of the Plan: (i) an Amended and Restated Assignment of Leases and Rents; (ii) an Amended and Restated Environmental Indemnity Agreement; (iii) an Amended and Restated Subordination of Asset Management Agreement and Management Fees – Metropolitan Real Estate Investors, LLC, a California limited liability company will sign as Manager of the Property); (iv) an Amended and Restated Subordination of Management Agreement and Management Fees; (v) an Amended and Restated Limited Guaranty; (vi) a Guaranty from Sole Member in favor of RBC (this Guaranty is required because of the addition of the Pledge Agreement with respect to the pledge of the Sole Member's membership interests in the Debtor); (vii) an Amended and Restated Deposit Account Control Agreement (Security Deposits) (Three Party Hard Lockbox) by and among Reorganized Debtor, RBC and PNC or successor thereto; (viii) an Amended and Restated Deposit Account Control Agreement (Three Party Hard Lockbox) by and among Reorganized Debtor, RBC and PNC or successor thereto; (ix) an Amended and Restated Deposit Account Control Agreement by and among Reorganized Debtor, RBC and BofA or successor thereto; (x) a Pledge and Security Agreement from Sole Member in favor of RBC; (xi) Limited Guaranty Agreement from IRSA/Marciano; (xii) Amended and Restated Environmental Indemnity Agreement from IRSA/Marciano; (xiii) Limited Joinder from IRSA/Marciano and NL; and (xiv) a state level UCC and a county level UCC fixture filing.

3.     *Revesting*

Except as otherwise provided for in the Plan or the Confirmation Order, on the Effective Date, without any further action, the Reorganized Debtor will be vested with all of the Property of the Estate (including the Preserved Avoidance Actions and all causes of action and claims other than the Avoidance Actions or any other claims or causes of action released under the terms of the Plan), free and clear of all Claims, Liens and Interests, and shall have all of the powers of a limited liability company under applicable law; provided, however, the foregoing shall not apply to the Reduced RBC Allowed Secured Claim and the liens granted in connection therewith described in Class 2 above which shall survive confirmation of the Plan. As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire and dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.     *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the

Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

5. _Reserves for Disputed Administrative, Priority Tax and Other Priority Claims_

On or before the Effective Date, the Reorganized Debtor (with funds provided by the Plan Funders) shall establish and maintain a reserve in an amount equal to all Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Other Priority Claims, if any, in an amount equal to what would be distributed to holders of Disputed Administrative, Disputed Priority Tax, and Disputed Other Priority Claims if their Disputed Claims have been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Reorganized Debtor. With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Reorganized Debtor to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Disputed Administrative, Disputed Priority Tax, and Disputed Other Priority Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed to Plan Funders (and not Reorganized Debtor). No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order or agreement of the parties.

6. _Reserves for Disputed Claims_

On or before the Effective Date, the Reorganized Debtor shall establish and maintain a reserve ("Class 3 Disputed Claim Reserve") for all Class 3 Disputed Claims in an amount not to exceed the Class 3 Reserve Payment and from the amounts provided by Plan Funders for such purpose. For purposes of establishing a reserve for Class 3 Disputed Claims, Cash will be set aside as soon as practicable after the Effective Date equal to the amount that would have been distributed to the holders of Class 3 Disputed Claims had their Class 3 Disputed Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court. With respect to such Class 3 Disputed Claims, if, when, and to the extent any such Class 3 Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Reorganized Debtor to the Claimant on the first business day following the end of the calendar quarter in which the Class 3 Disputed Claim becomes an Allowed Claim (or earlier in the discretion of the Reorganized Debtor) and in a manner thereafter consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining in the Class 3 Disputed Claim Reserve after all Class 3 Disputed Claims have been resolved and distributions made in accordance with the Plan, shall be released and remitted to Plan Funders (and not to Reorganized Debtor). No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order. No payments or distributions shall be made with respect to post-Petition Date interest accruing on any Claim. No payments or distributions shall be made with respect to Allowed Claims in an amount in excess of such Allowed Claims.

134588.00401/21794809v.26

7. *Claims Objection Deadline*

Objections to Claims shall be filed and served upon each affected Creditor by the Reorganized Debtor no later than ninety (90) days after the Effective Date ("Objection Deadline"), provided however, that the Objection Deadline may be extended by the Bankruptcy Court, upon motion of the Reorganized Debtor, without notice or hearing for up to an additional 120 days thereafter. The Objection Deadline shall automatically be extended without further order of the Court during the time period following the filing of the extension motion until such time as the Court enters an order granting or denying the requested extension. Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of, or other assertion of a Claim filed after the Confirmation Date shall be automatically disallowed as a late filed Claim, without any action by the Reorganized Debtor, unless and until the party filing such Claim obtains the written consent of the Reorganized Debtor or obtains an order of the Bankruptcy Court upon notice to the Reorganized Debtor that permits the late filing of the Claim, and the holder of such disallowed Claim shall be forever barred from asserting such Claim against the Debtor, the Estate or Property, Reorganized Debtor or their property. In the event any proof of claim is permitted to be filed after the Confirmation Date pursuant to an order of the Bankruptcy Court then, the Reorganized Debtor shall have sixty (60) days from the filing of such proof of claim or order to object to such Claim, which deadline maybe extended by the Bankruptcy Court upon motion of the Reorganized Debtor with or without notice or a hearing.

8. *Settlement of Disputed Claims*

Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in this section. After the Effective Date, and subject to the terms of this Plan, the Reorganized Debtor may settle any Disputed Claim where the result of the settlement or compromise is an Allowed Claim in an amount of $100,000 or less without providing any notice or obtaining an order from the Bankruptcy Court. All proposed settlements of Disputed Claims where the amount to be settled or compromised exceeds $100,000 shall be subject to the approval of the Bankruptcy Court after notice and an opportunity for a hearing.

9. *Unclaimed Property*

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim or Interest entitled thereto, such unclaimed property shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property shall be held in reserve by the Reorganized Debtor to be distributed Pro Rata to holders of Allowed Claims in such Class in accordance with this Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such unclaimed property will be distributed to the Reorganized Debtor.

10. *RBC Liens and Release of Liens*

The Liens securing the Reduced RBC Allowed Secured Claim shall survive Confirmation

and shall remain valid, enforceable and perfected Liens against property of the Reorganized Debtor.  On the Effective Date and except as expressly set forth in this Plan, all other mortgages, deeds of trust, Liens or other security interests against the Property of the Debtor's estate (or the MJM Interests) shall be released and forever discharged, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to Reorganized Debtor and its successors and assigns.

11.     _Withholding Taxes_

Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

12.     _Fractional Cents_

Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

13.     _Payments of Less than Twenty-Five Dollars_

If a cash payment otherwise provided for by this Plan with respect to an Allowed Claim would be less than twenty-five ($25.00) dollars (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of this Plan, the Reorganized Debtor shall not be required to make such payment and such funds shall be otherwise distributed to holders of Allowed Claims in such Class in accordance with the Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such excess fractional dollars will be distributed to the Reorganized Debtor.

**F.     _Treatment Of Executory Contracts And Unexpired Leases_**

1.     <u>Assumption of All Agreements</u>.  Any and all pre-petition leases or executory contracts (and not otherwise previously rejected or the subject of a motion to reject pending on the Confirmation Date), shall be deemed assumed by the Debtor effective as of the Confirmation Date, but subject to the occurrence of the Effective Date.  Without limiting the forgoing, on the Effective Date, the Ground Leases and all other leases of non-residential property with numerous tenants shall be deemed assumed by the Reorganized Debtor and the Reorganized Debtor shall continue to maintain custody and control of all security deposits posted by tenants in accordance with the terms of their leases and applicable non-bankruptcy law.   Notwithstanding the foregoing, the Plan Funders may designate executory contracts that are to be rejected by the Debtor (but excluding the Ground Leases and leases of non-residential property with numerous tenants all of which shall be assumed by the Debtor hereinafter "Core Contracts") no later than five (5) days prior to the Confirmation Hearing and Debtor shall promptly file such designation, if any, with the Bankruptcy Court and notify all affected counterparties.   Any undisputed cure payments shall be paid on the Effective Date of the Plan with any disputed cure claims to be paid upon further agreement of the parties or further order of the Bankruptcy Court.  Except for the Core Contracts, Reorganized Debtor reserves the right to reject any executory contract within 3 days following the entry of an order of the Bankruptcy Court fixing the disputed cure amounts

for such contract, in which case such contract shall then be deemed to have been rejected as of the Confirmation Date.

2.      Claims for Damages.  All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases, if any, shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court, within thirty (30) days after the mailing of notice of Effective Date. All proofs of claim with respect to Claims arising from the rejection of executory contracts shall be treated as Class 3 General Unsecured Claims, as applicable, for purposes of a distribution pursuant to the Plan, unless and until the Person or Entity asserting such Claim obtains an order of the Bankruptcy Court, upon notice to the Debtor, that allows the Claims in another Class under the Plan. Unless otherwise permitted by Final Order, any proof of claim that is not filed before the earlier of the Bar Date or the Confirmation Hearing (other than those Claims arising from the rejection of executory contracts or leases which may be filed within thirty (30) days after mailing of the notice of Effective Date as set forth above) shall automatically be disallowed as a late filed Claim, without any action by the Reorganized Debtor, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtor, the Estate, the Reorganized Debtor or property of Reorganized Debtor. Without prejudice to the Debtor's rights, the Debtor does not anticipate the rejection of any executory contracts and believes there will be no rejection damage Claims filed.

## G.      Effect of Confirmation of the Plan

Without limiting any provision of the Plan, the Plan provides for the following release, exculpation, discharge and injunctions:

1.      *General Release by Debtor and Third Parties.*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration provided by each of the Released Parties (which consideration includes, without limitation, the investment in respect of the New Membership Interests, the discharge of a substantial portion of the RBC Loan, and the provision of the services of the Released Parties in facilitating the expeditious implementation of the transactions contemplated hereby), on the Effective Date and effective as of the Effective Date, the Released Parties are deemed released and discharged by the Debtor and its Estate from any and all direct, indirect or derivative claims, obligations, rights, suits, judgments, Liens, damages, causes of action, remedies, liabilities, claims or rights of contribution and indemnification, and all other claims, causes of action, controversies of every type, kind, nature, description or character whatsoever, including any derivative claims asserted on behalf of the Estate, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, currently existing or hereafter arising, in law, at equity, whether for tort, fraud, contract or otherwise, that the Debtor would have been legally entitled to assert, including, but not limited to, any claim or cause of action arising from or relating to the Debtor, the Chapter 11 Case, the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest of the Released Parties that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the negotiation, formulation, or preparation of the Plan and the Disclosure Statement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place, in each case to the

extent incurred on or prior to the Effective Date, other than in each case claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in Section 7.1 of the Plan, nothing contained herein or elsewhere in the Plan or the Plan Supplement shall alter, affect, impair or constitute a waiver of the indemnification obligations of Metropolitan Real Estate Investors LLC or Mr. Haim Revah under Article VIII of the IRSA Agreements or the Preserved Avoidance Actions, which indemnification obligations shall survive and not be released hereunder.

2.  *Exculpation*

On the Effective Date, (a) the Debtor, and its direct and indirect parents, subsidiaries and affiliates, together with each of its present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) and (b) RBC, MTAL, MJM and the Plan Funders and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) shall be deemed to release each of the other, and shall be deemed released by all holders of Claims or Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission occurring through the date immediately preceding the Effective Date that arise from or are related to the Third Avenue Property and the ownership thereof, including, without limitation, any act or omission occurring during or relating to the Chapter 11 Case, commencement of the Chapter 11 Case, the solicitation of acceptances of this Plan, the Exit Facility Commitment Letter, the Plan Funding Equity Commitments, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code. Notwithstanding the foregoing but without in any way effecting the releases in favor of RBC and its direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general parties, limited partners, officers, directors, employees, agents, representatives, attorneys, advisors or consultants which shall remain in full force and effect (hereinafter "RBC Exclusion"), nothing contained herein or elsewhere in the Plan shall affect (or constitute a waiver of) the rights that (i) members, and persons and entities having direct or indirect ownership or other beneficial interests in any of them, of MTAL may have pursuant to the LLC Agreement and/or any of the other numerous agreements and other instruments entered into by any of them governing, relating to or otherwise in connection with their respective interests in MTAL, (ii) members of MTAL (and other signatories thereof) may have pursuant to the Members Agreement; (iii) Sponsor Member or the members of Sponsor Member may have under numerous agreements with Plan Funders (and/or their related entities and affiliates) with respect to the Third Avenue Property and the ownership thereof, including the IRSA Agreements and Tao-Menofim Agreements (collectively "Transfer Agreements"); or (iv) IRSA International LLC or Marciano Investment Group LLC may have against Metropolitan Real Estate Investors LLC or Haim Revah under Article VIII of the IRSA Agreements.

3. *Discharge*

Except as otherwise provided for in the Plan or in the Confirmation Order, in accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge effective as of the Effective Date of all debts, Claims against, Liens on, and Interests in the Debtor, its assets and Property, which debts, Claims, Liens and Interests arose at any time before the entry of the Confirmation Order. The discharge of the Debtor shall be effective as to each Claim and Interest, regardless of whether a proof of Claim or Interest was filed or whether the Claim or Interest was Allowed or whether the holder of the Claim or Interest votes to accept the Plan. On the Effective Date, as to each and every discharged Claim and Interest, any holder of such Claim or Interest shall be precluded from asserting such Claim or Interest against the Debtor or Reorganized Debtor or their assets or properties.

4. *Confirmation Injunction*

On and after the Confirmation Date, except to enforce the terms and conditions of the Plan before the Bankruptcy Court, to enforce rights, obligations and or remedies that may arise or otherwise be available pursuant to or in connection with the agreements referred to in clauses (i) through (iv) of the last sentence of paragraph 12.7 of the Plan (but subject to the RBC Exclusion), and to enforce the parties' rights under the Transfer Agreements, all Persons or Entities who have held, hold or may hold any Claim against or Interest in the Debtor (which arise from or are related to the Third Avenue Property and the ownership thereof) is, with respect to any such Claim against or Interest in the Debtor (which arise from or are related to the Third Avenue Property and the ownership thereof), permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Debtor or Reorganized Debtor or any of its properties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or Entities and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants, or any property of any of the foregoing (collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, against any of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of the Protected Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any of the Protected Parties (except to the extent expressly asserted in a timely filed proof of claim); and (e) taking any actions in any place and in any manner whatsoever, in each case that do not conform to or comply with the provisions of the Plan. Notwithstanding the foregoing, nothing contained herein or elsewhere in the Plan or the Plan Supplement shall alter, affect or constitute a waiver of or otherwise impair the indemnification rights of IRSA International LLC or Marciano Investment Group LLC against Metropolitan Real Estate Investors LLC or Haim Revah under Article VIII of the IRSA Agreements.

134588.00401/21794809v.26

5. *Comprehensive Settlement of Claims and Controversies.*

Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all claims or causes of action of, (a) the Debtor, its Estate, including, without limitation, any Person or Entity seeking to exercise a right in a derivative capacity on behalf of the Estate and (b) the Released Parties, and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor, the Estate, its property and Claim and Interest holders and is fair, equitable and reasonable. Notwithstanding the foregoing, nothing contained herein or elsewhere in the Plan or in the Plan Supplement shall alter, affect or constitute a waiver of or otherwise impair the indemnification rights of IRSA International LLC or Marciano Investment Group LLC against Metropolitan Real Estate Investors LLC or Haim Revah under Article VIII of the IRSA Agreements.

6. *Insurance*

This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtor (including, without limitation, their members, managers or officers) or any other person or entity. Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtor or the carriers.

## H. Retention of Jurisdiction

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the case, the Plan, and the Confirmation Order to the fullest extent permitted by law pursuant to, and for the purposes of Section 105(a) and Section 1142 of the Bankruptcy Code and for the other purposes described in Article X of the Plan.

## I. Miscellaneous Provisions

1. *Pre-Confirmation Modification*

On notice to and opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Debtor before the Confirmation Date as provided in section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders in accordance with the Equity Commitment, and GS and RBC in accordance with the provisions of the Plan Support Agreement – Equity.

2. *Post-Confirmation Immaterial Modification*

With the approval of the Bankruptcy Court and on notice to and an opportunity to be

heard by the United States Trustee and without notice to holders of Claims and Interests, the Debtor or Reorganized Debtor, may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders, GS and RBC.

3. *Post-Confirmation Material Modification*

On notice to and an opportunity to be heard by the United States Trustee, the Plan may be altered or amended after the Confirmation Date by the Reorganized Debtor in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders, GS and RBC.

4. *Withdrawal or Revocation of the Plan and Section 1129(b) Cram-Down*

The Debtor (with the consent of RBC) reserves the right to revoke or withdraw the Plan prior to the Confirmation Date or to seek to use the cram down provisions of Section 1129(b) (after amending this Plan) as to Class 3 Creditors in the event that Section 10.2(f) of the Plan is not satisfied. If the Debtor withdraws the Plan or if confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the allowance, fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, the Equity Commitment Plan Support Agreement shall terminate and be of no further force or effect in the case of a withdrawal or revocation of the Plan (but not in the case where Section 1129(b) cram-down is being utilized as to Class 3 creditors in which case the Equity Commitment Plan Support Agreement shall remain in full force and effect) and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of Debtor or any other Person or (iii) constitute an admission of any sort by the Debtor or any other Person.

5. *Payment of Statutory Fee*

All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) by the Reorganized Debtor. The Debtor and Reorganized Debtor shall pay all United States Trustee quarterly fees under 28 U.S.C. Section 1930(a)(6), plus interest due under 31 U.S.C. Section 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a Final Decree, dismissal of the case, or conversion of the case to a case under chapter 7.

6. *Successors and Assign*

The rights, benefits and obligations of any Person or Entity named or referred to in the

Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

7. _Exemption From Transfer Taxes_

Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer or other consideration under, in the furtherance of, or in connection with, the Plan, including, without limitation, the delivery of the MJM Payment to MJM for distribution onto MTAL, the distribution by MTAL of the MJM Payment to the members of MTAL pursuant to the LLC Agreement and any other payments by Plan Funders to MTAL or the members of MTAL, on account of the extinguishment of the MJM Interest, the issuance of the membership interest in the Reorganized Debtor to Plan Funders, the treatment of the RBC Claim, the payments made under the IRSA Agreements and the Tao-Menofim Agreements, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held to be a stamp tax or other similar tax by applicable law.

**J. _Conditions to Confirmation and Effectiveness of the Plan_**

Conditions to Confirmation of the Plan. The Plan shall not be confirmed unless and until the following conditions have been satisfied in full or waived by the Debtor and the Plan Funders, GS and RBC:

(a) The Confirmation Order shall be in form and substance satisfactory to the Debtor, GS, RBC and Plan Funders, which Confirmation Order shall approve all provisions, terms and conditions of the Plan, the Plan Supplement documents and the repayment of the Reduced RBC Secured Claim; and

(b) No material amendments, modifications, supplements or alterations shall have been made to the Plan, any document contained in the Plan Supplement or any other document delivered in connection therewith, without the express written consent of the Debtor, RBC, GS and Plan Funders (which consent may be granted, withheld, or conditioned in their respective reasonable discretion).

**K. _Conditions to Effectiveness of the Plan_**

The Plan shall not become effective unless and until each of the following conditions has been satisfied in full or waived by each of the Debtor, the Plan Funders and RBC (but as to Subsections, (b), (e), (f) and (h) below, waived by the Debtor and RBC, as to Subsection (f), waived by the Debtor, RBC and GS and as to Subsection (a) below, waived by Debtor, RBC, GS and Plan Funders):

(a) The Bankruptcy Court shall have entered the Confirmation Order by

March 31, 2011 (or such other date as agreed to by Debtor, Plan Funders and RBC), the same shall be in full force and effect and not be subject to any stay or injunction and such Order shall be in form and substance satisfactory to the Debtor, RBC, GS and Plan Funders;

(b) All escrow and reserve accounts described in the Plan have been adequately funded;

(c) All conditions precedent to the repayment of the Reduced RBC Allowed Secured Claim shall have been satisfied or otherwise waived by RBC;

(d) All conditions to the obligation of the Plan Funders to fund the Plan Funders Consideration shall have been satisfied or otherwise waived by the Plan Funders;

(e) The Plan Funders shall have funded their equity commitments under the terms of the Equity Commitment Plan Support Agreement simultaneously with the other transactions to occur on the Effective Date;

(f) MJM shall have received the MJM Payment, subject to the distribution provisions of Section 5.2 of the Plan;

(g) Class 3 General Unsecured Claims that were not incurred in the ordinary course that are filed by the Bar Date (plus those set forth on the Debtor's Schedules, as adjusted to avoid duplication) shall not exceed the sum of $1,000,000.00 plus the maximum amount of all potential rejection damage claims, if any, that arise because of the exercise of Plan Funder's rights under Section 9.1 of the Plan ("RD Claims") to the extent that such Class 3 General Unsecured Claims and the RD Claims, if any, exceed $1,000,000 as determined by the Plan Funders and RBC in their reasonable discretion; and

(h) The Initial RBC Payment and the RBC Expenses shall have been received by RBC.

Each of the conditions set forth in Section 10.2 of the Plan may be waived in whole or in part by the Debtor (with the consent of RBC and Plan Funders, such consent not to be unreasonably withheld) and with the consent of GS to Subsections (a) and (f) above without notice or a hearing.

Effect of Failure of Condition. In the event that the conditions specified above have not occurred on or before sixty (60) days after the Confirmation Date, the Confirmation Order may be vacated upon order of the Bankruptcy Court after motion made by the Debtor or any party in interest and an opportunity for parties in interest to be heard.

### L. *Provisions Regarding Corporate Governance and Management of the Reorganized Debtor*

    (a)    Members, Officers and/or Managers of Reorganized Debtor
              [as set forth in the Plan Supplement]

## VIII.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The Disclosure Statement and the material incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934.  All statements other than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Debtor's financial position, and plans and objectives, including, but not limited to, statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements.

### A. *Taxation*

Pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving cash or property under the Plan will recognize gain or loss equal to the difference between the amount of any cash and the fair market value of any other property received by such holder and the basis which the holder has in such Allowed Claim or Interest.  The character of any recognized gain or loss will depend upon the status of the holder, the nature of the Claim or Interest and the period for which the Claim or Interest was held by the holder.  The basis of a holder in any property received under the Plan will be the fair market value of such property on the Effective Date of the Plan, and the holding period in such property received will begin on the Effective Date.

The federal, state and local tax consequences of the Plan are complex and, in some cases, uncertain.  In addition, the foregoing summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim or Interest in light of its particular circumstances and income tax situation.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, and local tax consequences of the Plan.

### B. *Distributions to Holders of Claims*

The Plan is based on making Distributions as provided under the priority scheme set forth in the Bankruptcy Code.  To this end, the Plan provides that all Allowed Administrative Claims and Priority Claims will be paid or satisfied in full prior to the making of Distributions to holders

of Allowed Claims in Class 2 and 4. Under the terms of the Plan and subject to the occurrence of the Effective Date, RBC has agreed to waive its deficiency claim of approximately $80,000,000 plus interest, costs, fees, penalties and expenses. Absent that waiver, distributions to creditors would be vastly different and substantially impaired.

## C. Objections to Classification

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class. The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

## D. Inherent Uncertainty of Financial Projections

The financial projections attached to the Plan Supplement are based upon numerous assumptions that are an integral part of such financial projections, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, funding by RBC of the Exit Facility, industry performance, vacancy rates, general business and economic conditions, competition, adequate financing, absence of material contingent or unliquidated litigation or indemnity claims, and other matters, many of which are beyond the control of the Reorganized Debtor and some or all of which may not occur. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtor's operations. These variations may be material and may adversely affect the ability of the Reorganized Debtor is to pay the obligations owing under the Plan and other post-Effective Date indebtedness. Because the actual results achieved throughout the periods covered by the financial projections may differ from the projected results, the financial projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

## E. Certain Bankruptcy Law Considerations

### 1. Risk of Non-Confirmation of the Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. The Plan represents a negotiated settlement between all impaired creditors so the Debtor believes the same is fair and non-discriminatory, is in the best interests of creditors and is feasible and not likely to be followed by a further liquidation. However, there can be no guarantee that the Bankruptcy Court will reach the same conclusion.

### 2. Risk of Non-Occurrence of the Effective Date

All Classes of Claims and Interests that are entitled to vote have voted to accept the Plan. The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied although the Debtor does not anticipate the same.

3. *Appeal of the Confirmation Order*

The Confirmation Order may be the subject of an appeal. If the Confirmation Order is vacated on appeal (assuming an appeal could be taken and such appeal would not be rendered moot due to substantial consummation of the Plan prior to prosecution), the Plan would fail.

# IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtor under chapter 7 of the Bankruptcy Code or (ii) an alternative plan of reorganization.

## A. *Liquidation Under Chapter 7*

If no plan is confirmed, the case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's property for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of Claims and Interests is set forth in the Liquidation Analysis attached to the Plan Supplement. The Debtor believes that liquidation under Chapter 7 will result in smaller distributions being made to creditors than those provided for in the Plan because (i) the Debtor's assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be incurred, (iii) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a termination of the Debtor's businesses, (iv) the liens in favor of RBC far exceed the value of the Debtor's property, and (v) the Plan provides for payment in full to Creditors holding Allowed Unsecured Claims while a forced liquidation will result in unsecured creditors receiving no distribution on account of their claims.

## B. *Alternative Plan of Reorganization*

The Debtor believes that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances. The Debtor believes that any liquidation of the Debtor's assets or alternative form of Chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Debtor believes that its Plan provides the best recovery to their creditors by providing them with a distribution rather than diminished or no recoveries following a liquidation of its assets.

134588.00401/21794809v.26

# X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. *Federal Income Tax Consequences in General*

The following summary addresses certain material federal income tax consequences of the implementation of the Plan to holders of Allowed Claims in Class 2 and 3 and holders of Allowed Interests in Class 4. The summary is based upon the Debtor's interpretation of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all of which are subject to change, possibly with retroactive effect. Due to the complexity of certain aspects of the Plan and differences in the nature of the Claims and Interests of the various holders thereof, their taxpayer status, residence and methods of accounting and prior actions taken by such holders with respect to their Claims and Interests, the tax consequences described below are general in nature and are subject to significant considerations applicable to each holder of an Allowed Claim in Class 3 or an Allowed Interest in Class 4.

The federal income tax consequences of the Plan and the formation and operation of the Reorganized Debtor are complex and subject to significant uncertainties. The Debtor's interpretation of the federal income tax consequences set forth herein are not binding on the IRS, and the Debtor has not requested, and do not intend to request, an administrative ruling from the IRS with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be acceptable to the IRS. No opinion of counsel has either been sought or obtained with respect to the federal, state, local or foreign tax aspects of the Plan. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Additionally, changes in the facts or circumstances relating to the consummation or operation of the Plan or the formation or operation of the Reorganized Debtor or the Liquidation Trust could likewise affect the tax consequences to such parties.

This summary does not address foreign, state or local tax consequences of the Plan, or Reorganized Debtor, nor does it purport to address all of the federal income tax consequences of the Plan or Reorganized Debtor. This summary also does not purport to address the federal income tax consequences of the Plan, or Reorganized Debtor to taxpayers subject to special treatment under the federal income tax laws, such as banks, governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual funds, regulated investment companies, foreign corporations, and foreign persons.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR INTEREST. ANY U.S. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (I) IS NOT INTENDED TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES IMPOSED ON SUCH PERSON AND (II) WAS WRITTEN IN CONNECTION WITH THE MARKETING OR PROMOTION OF THE PLAN. IT IS STRONGLY RECOMMENDED THAT EACH

HOLDER OF A CLAIM OR INTEREST CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

## B. *Federal Income Tax Consequences to the Debtor*

### 1. *Cancellation of Indebtedness*

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Section 108 of the Tax Code provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the Bankruptcy Court or is pursuant to a plan approved by the Bankruptcy Court.

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of discharge has been determined Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

## C. *Federal Income Tax Consequences to Holders of Allowed Claims in Class 3*

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim in Class 3 will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States. The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

### 1. *Receipt of Cash and Property by Holders of Allowed Claims in Class 3*

Generally, a holder of an Allowed Claim in Class 3 will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim. In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR 'OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

2. *Receipt of Interest*

Pursuant to the Plan, consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on such Allowed Claims may be treated as receiving taxable interest, to the extent of any consideration they receive under the Plan that is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

3. *Character of Gain or Loss*

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes may attract differing treatment); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.

4. *Withholding*

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding.

**D.     Federal Income Tax Consequences to Holders of Allowed Class 4 Interests**

The transactions contemplated by the Plan may cause some holders of Interests in the Debtor to recognize income, including cancellation of indebtedness income, with no corresponding cash distribution.

HOLDERS OF ALLOWED INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX TREATMENT RELATED TO THEIR INTERESTS UNDER THE PLAN.

134588.00401/21794809v.26

*E.*     *Importance of Obtaining Professional Tax Assistance*

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IN ACCORDANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE IN CIRCULAR 230, UNLESS EXPRESSLY STATED OTHERWISE IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS), ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE TAX CODE OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR OTHER MATTER ADDRESSED HEREIN.

**[The Remainder of the Page Intentionally Left Blank]**

134588.00401/21794809v.26

## <u>CONCLUSION</u>

The Debtor believes the Plan is in best interest of all creditors and recommends those entitled to vote to accept the Plan.

DATED: November 12, 2010

**<u>DEBTOR</u>:**

**Metropolitan 885 Third Avenue Leasehold, LLC a Delaware limited liability company**

By:    Metropolitan 885 Third Avenue Leasehold Sub Junior Mezz LLC, its sole member

    By:    Metropolitan 885 Third Avenue Leasehold Holdings LLC, a Delaware limited liability company, its sole member

        By:    Metropolitan 885 Third Avenue LLC, a Delaware limited liability company, its managing member

            By:    Metropolitan Real Estate Investors, LLC, a California limited liability company, its managing member

                By:    */s/ Jacob Abikzer*
                Name: Jacob Abikzer
                Title:   Member